**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ALEJANDRO OCHOA, an individual,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>COUNTY OF KERN, a municipal entity; DEPUTY BROCK (Badge No. 201765), an individual; DEPUTY ANDREW BASSETT (Badge No. 202312), an individual; and DOES 1 through 10, inclusive,<br><br>　　　　Defendants. | Case No. 1:18-CV-01599-JLT-CDB<br><br>ORDER DENYING PLAINTIFF'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, OR ALTERNATIVELY, FOR A NEW TRIAL<br><br>(Doc. 131) |

On November 19, 2018, Alejandro Ochoa filed a complaint against the County of Kern, Deputy Ryan Brock, and Deputy Andrew Bassett under 42 U.S.C. § 1983, alleging the Deputies used excessive force when seizing him on January 27, 2018. (Doc. 1 at 1-3.) Ochoa brought claims for excessive force under the Fourth Amendment and state law claims for negligence and battery. (*Id.* at 1.) Beginning on October 31, 2022, the Court held a five-day jury trial. During trial, Ochoa stipulated to dismissal of the battery claim. (Doc. 135 at 128.) At the close of evidence, Ochoa made a motion for judgment as a matter of law. (Doc. 134 at 659.) On November 8, 2022, the jury returned a verdict for the Defendants on the remaining claims. (Doc. 125.) On December 7, 2022, Ochoa renewed his motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) and, in the alternative, motioned for a new trial. (Doc. 131.) For the reasons set forth below, the Court **DENIES** the motion in its entirety.

## I.  FACTUAL BACKGROUND

Although the parties agree about the major events that occurred during the Deputies' confrontation with Ochoa, the parties' briefs set forth contradictory versions of many details surrounding the events. In accordance with the standards of review for a Rule 50(b) motion, the below summary of the events recounts the totality of the evidence, and where contradictions exist, the Court takes the version most favorable to Defendants.[1]

On January 27, 2018, Deborah Ochoa, the estranged wife of Alejandro Ochoa, received a text message from her daughter that Ochoa was inside the residence with her. (Doc. 131-2 at 2.) Deborah called 9-1-1 and informed the dispatcher of Ochoa's presence in the home and the existence of an outstanding no-bail warrant for Ochoa's arrest. (*Id.* at 2; Doc. 142-1 at 33.) Through texts with her daughter, Deborah also informed the dispatcher that she did not believe Ochoa had weapons in the home but that he would not allow her daughter or the two others in the house to leave. (Doc. 131-2 at 2.) The 9-1-1 dispatcher relayed the information to responding officers, including Deputies Brock and Bassett. (Doc. 142-1 at 32.) Deputies Brock and Bassett testified that they received additional information prior to arrival at the residence. They were informed that Ochoa's outstanding no-bail warrant resulted from a charge for felony spousal abuse, for which Ochoa failed to appear. (*Id.* at 9, 33.) The responding officers also received information that it was uncertain whether Ochoa had a weapon in the residence. (*Id.* at 10, 34.)

When the Deputies arrived outside the residence, they announced their presence and gave numerous commands and warnings to Ochoa to come out and submit to arrest. (Doc. 142-1 at 35-36.) When Deputy Bassett arrived, he saw a female in a window in the house. (*Id.* at 8, 35.) He instructed the female open the window to escape, but she was unable to do so. (*Id.*) She appeared frightened. (*Id.*) Deputy Bassett believed "there were people inside that house that were not able to leave and being held against their will." (*Id.* at 8.) The responding officers waited for Deborah Ochoa to arrive with the house key, which they used to gain access inside the home.[2] (*Id.* at 38.)

---

[1] The facts as stated in Ochoa's motion largely disregards or overlooks much of the contrary evidence. (Doc. 131 at 4-9.) Rather than detail each piece of evidence that contradicts Ochoa's factual assertions, the Court's summary above follows the appropriate standards for reviewing the evidence on a Rule 50(b) motion.
[2] Initially, the officers attempted to enter through the front door, but every time they turned the key in the lock, Ochoa

2

After entering the home, officers rescued the three known occupants that Ochoa was holding hostage, but they were unsure whether Ochoa had other hostages in the home. (Doc. 142-1 at 8.) Ochoa locked himself in the bathroom prior to the officers entering the home. (Doc. 135 at 47-49.) Before entering the bathroom, officers gave multiple commands and warnings, in Spanish and English, for Ochoa to exit the bathroom with his hands on his head. (Doc. 142-1 at 13, 16.) Both outside the home and outside the bathroom, Deputy Bassett, who handles a police canine named Hero, instructed Hero to bark to alert Ochoa of his presence. (*Id.* at 36-39.) Ochoa refused to comply with officers' instructions or heed their warnings. (*Id.* at 16.) When officers breached the bathroom door, Ochoa was seated on the toilet, screaming, with his shorts pulled up and with his hands near his waistband. (*Id.* at 13-14, 22.) Officers had not yet had an opportunity to search Ochoa or the bathroom for weapons. (*Id.* at 10, 24.) Additionally, they could not see all areas of the bathroom. (*Id.* at 15.)

Deputy Brock gave Ochoa two or three commands to show his hands and to put them over his head. (Doc. 142-1 at 12.) Ochoa did not comply. (*Id.* at 13.) Deputy Brock then fired a 40 mm less-than-lethal round, aiming for Ochoa's torso. (Doc. 142-1 at 13-14.) Ochoa stood while the shot was fired, and it struck him in the testicle. (Doc. 133 at 136-37.) Deputy Brock and another officer managed to get Ochoa face down on the ground. (Doc. 135 at 13; Doc. 142-1 at 7.) Ochoa continued to physically struggle against the attempts to detain him. (Doc. 142-1 at 7.) Deputy Bassett released Hero to subdue Ochoa, who bit him in the arm and shoulder, and this allowed officers to effectuate the arrest. (*Id.* at 3, 7; Doc. 131-3 at 12.)

After a five-day jury trial, the jury returned a verdict in favor of Defendants. (Doc. 125.) The special verdict form shows that the jury found neither Deputy Brock nor Bassett used excessive force against Ochoa or acted negligently. (*Id.* at 1-2.) Ochoa filed a motion for judgment as a matter of law or new trial contending insufficient evidence exists to support the jury verdict. (Doc. 131.)

///

---

turned the lock from inside, preventing the officers from entering. Finally, the officers entered through the back door.

## II. LEGAL STANDARD

Motions for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) do not stand alone, but rather are renewed Rule 50(a) motions. If the trial judge denies or defers ruling on a Rule 50(a) motion during trial, and if the jury then returns a verdict against the moving party, that party may renew its motion under Rule 50(b). A party seeking judgment as a matter of law has a "very high" standard to meet. *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002). A motion for judgment as a matter of law under Rule 50(b) is appropriate when the "evidence permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Martin v. Cal. Dep't of Veterans Affs.*, 560 F.3d 1042, 1046 (9th Cir. 2009); *Josephs v. Pacific Bell*, 443 F.3d 1050, 1062 (9th Cir. 2006).

A jury verdict "must be upheld if it is supported by substantial evidence . . . even if it is also possible to draw a contrary conclusion." *Pavao v. Pagay*, 307 F.3d 915, 918 (9th Cir. 2002). In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Fisher v. City of San Jose*, 558 F.3d 1069, 1074 (9th Cir. 2009) (internal quotations omitted). "[C]redibility, inferences, and factfinding are the province of the jury, not [the] court." *Costa v. Desert Palace*, 299 F.3d 838, 859 (9th Cir. 2002). The Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *EEOC v. Go Daddy Software, Inc.*, 581 F.3d 951, 961 (9th Cir. 2009). However, "a reasonable inference cannot be supported by only threadbare conclusory statements instead of significant probative evidence . . . Consequently, JMOL is appropriate when the jury could have relied only on speculation to reach its verdict." *Lakeside–Scott v. Multnomah Cnty.*, 556 F.3d 797, 802-03 (9th Cir. 2009) (internal quotations omitted). "While the court must review the entire evidentiary record, it must . . . disregard all evidence favorable to the moving party that the jury is not required to believe." *Harper v. City of L.A.*, 533 F.3d 1010, 1021 (9th Cir. 2008). The court gives credence to evidence in favor of the moving party only if it is "uncontradicted and unimpeached" and "comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

///

### III. DISCUSSION

Ochoa contends that the jury's verdict and its finding that the Deputies did not use excessive force "were against the clear weight of the evidence." (Doc. 131 at 2.) Although the jury made findings as to both the Fourth Amendment excessive force claims and the negligence claims, Ochoa's motion only addresses the legal standards for the Fourth Amendment claims. Therefore, the Court limits its discussion to the Fourth Amendment claims.

**A.   Excessive Force under the Fourth Amendment**

The Fourth Amendment of the U.S. Constitution prohibits unreasonable seizures. Whether the seizure of a person was unconstitutionally unreasonable turns on an objective standard evaluating all the facts and circumstances confronting the officers. *Bryan v. Macpherson*, 630 F.3d 805, 823-24 (9th Cir. 2010). The standard balances the "nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interest at stake." *Id.*; *see also Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022). "Stated another way, we must balance the amount of force applied against the need for that force." *Bryan*, 630 F.3d at 823-24.

The objective reasonableness assessment of a particular use of force requires a three-step inquiry. *Glenn v. Wash. Cty.*, 673 F.3d 864, 871 (9th Cir. 2011). It necessitates evaluation of (1) the type and amount of force used; (2) the government's countervailing interests in the need to use that force; and (3) a balancing of steps one and two to determine the overall reasonableness under the circumstances. *Id.* "[T]he reasonableness of force used is ordinarily a question of fact for the jury." *Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. July 21, 1997). "Because the excessive force inquiry nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit has] held on many occasions that . . . judgment as a matter of law in excessive force cases should be granted sparingly." *Avina v. United States*, 681 F.3d 1127, 1130 (9th Cir. 2012) (internal quotations omitted).

**B.   Type and Amount of Force Used**

The Court must "first assess the quantum of force used to arrest the plaintiff by considering the type and amount of force inflicted." *Drummond ex rel. Drummond v. City of*

5

*Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (internal quotations omitted). "Some uses of force can be quantified categorically. The best example is shooting a firearm, which by definition is 'deadly force': force that 'creates a substantial risk of causing death or serious bodily injury.'" *Seidner v. de Vries*, 39 F.4th 591, 596 (9th Cir. 2022) (quoting *Smith v. City of Hemet*, 394 F.3d 689, 693 (9th Cir. 2005). "Most often, however, quantifying a particular use of force requires consideration of the specific factual circumstances surrounding the event." *Id.* at 597. Both "[t]he nature and degree of physical contact" and the "risk of harm and the actual harm experienced" are relevant. *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1152 (9th Cir. 2022).

Regarding Deputy Brock's use of the 40mm less-than-lethal round, the Ninth Circuit has held that a cloth-cased shot, similar to a rubber bullet, is capable of inflicting "serious injury" but does not qualify as deadly force. *Deorle v. Rutherford*, 272 F.3d 1272, 1279-80 (9th Cir. 2001). Nonetheless, "a strong governmental interest" must exist to compel the employment of such force. *Id.* Following this precedent, district courts have found non-lethal rounds constitute "significant force." *See Washington v. City of L.A.*, 2018 WL 6131603, at *5 (C.D. Cal. Apr. 16, 2018), aff'd, 791 F. App'x 683 (9th Cir. 2020) (finding a 40 mm less lethal launcher and foam projectile is "significant use of force" capable of causing serious injury); *see also Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1086-87 (N.D. Cal. Aug. 10, 2020) (same for rubber bullets and flashbang grenades).

Ochoa contends Deputy Brock's shot constitutes "significant force" for which officers need a "strong governmental interest." (Doc. 131 at 10-11.) In their opposition, Defendants do not dispute this characterization. It is undisputed that Ochoa suffered substantial physical injuries to his groin as a result of Deputy Brock's 40 mm less-than-lethal shot. (Doc. 133 at 143-45.) Given their non-opposition and the Ninth Circuit precedent, the Court adopts Ochoa's categorization of the 40 mm less-than-lethal shot as significant force that requires a strong governmental interest to compel employment of such force.

Regarding Deputy Bassett's use of Hero to subdue Ochoa, deployment of a police dog may constitute "a severe use of force [or] a moderate use of force depending on the suspect's condition when the dog was ordered to attack, how long the attack lasted, and whether the dog

was within its handler's control." *Seidner*, 39 F.4th at 597. For example, in *Lowry v. City of San Diego*, the deployment of a police canine amounted to moderate force because the handler called off the canine quickly after the initial contact and the canine only bit the suspect's upper lip, causing her to receive three stitches. 858 F.3d 1248, 1254, 1257 (9th Cir. 2017). Therefore, the police canine posed a moderate risk of harm and actual injury. *Id.* at 1257. In contrast, the deployment of the canine in *Chew v. Gates*, where the handler sent the dog into a building beyond the reach of his commands and the dog bit the suspect, dragged him four to ten feet, and nearly severed his arm, amounted to a severe level of force. 27 F.3d 1432, 1441 (9th Cir. 1994).

Ochoa contends the deployment of the police canine amounts to "intermediate" to "severe" use of force, given the type of wounds Ochoa sustained. (Doc. 131 at 11-12.) Hero bit Ochoa on his arm and shoulder, leaving puncture wounds and lacerations. (Doc. 131-3 at 11-14.) Ochoa sustained bite injuries to the area but does not assert that he lost any function of the arm. (Doc. 133 at 146, 150.) Deputy Bassett testified he deployed Hero only a few feet away from Ochoa and remained in command of Hero during the encounter. (Doc. 135 at 13, 103.) The circumstances surrounding the deployment of Hero do not amount to the severity of risk posed or actual harm caused by the canine in *Chew*. However, they rise above the minimal injury sustained and contact made in *Lowry*. For the purposes of this motion and without opposition from Defendants on this matter, the Court concludes the deployment of Hero amounts to intermediate force, requiring a strong governmental interest for the use of force. *See Deorle*, 272 F.3d at 1284-85 ("Less than deadly force that may lead to serious injury may be used only when a strong governmental interest warrants its use[.]").

**C.    Reasonableness and Need of Force Factors**

The second step is to determine the government's countervailing interests at stake in deploying the force used. *Graham v. Connor*, 490 U.S. 386, 396 (1989). In *Graham*, the Supreme Court provided three relevant factors to evaluate the circumstances facing the officers and their interests in using force: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect actively resisted arrest or attempted to escape. *Id.* at 396. However, this list is not exhaustive, and courts

must examine the totality of the circumstances to determine "whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*." *Bryan*, 630 F.3d at 826. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 at 396-97; *see also Andrews v. City of Henderson*, 35 F.4th 710, 715 (9th Cir. 2022). An officer's subjective intent or motivation is not relevant to the reasonableness inquiry. *See Graham*, 490 U.S. at 397-99; *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017).

Throughout Ochoa's briefing, he mischaracterizes the legal standard for evaluating excessive force by maintaining that the inquiry only considers the facts and circumstances at the moment or immediately before the Deputies used force. (*See* Doc. 131 at 15; Doc. 143 at 11-14.) For example, in his reply, Ochoa lists many facts that the Defendants recited in their opposition and which describe circumstances or information received by the Deputies throughout the day and leading up to their confrontation with Ochoa. (Doc. 143 at 11-14 (e.g., the warrant for Ochoa's arrest resulted from "an outstanding felony warrant for felony spousal abuse;" "The deputies were aware that prior to their arrival plaintiff was not allowing two women and a child to leave the residence.").) Ochoa contends this information "has nothing to do with the facts and circumstances facing Deputies Brock and Bassett at the time force was used" because they do not describe Ochoa's actions "at the time force was used." (*Id.*) Ochoa provides no legal authority for his assertion, and he contradicts established precedent that instructs courts and juries to consider the totality of the circumstances known to the officers when encountering a suspect. To evaluate excessive force, the Court does not look at the isolated moment immediately prior to the use of force to assess the suspect's actions and need for force. *Hung Lam v. City of San Jose*, 869 F.3d 1077, 1087 (9th Cir. 2017) (holding the "events leading up to" the use of force are included in the totality of circumstances); *see also George v. Morris*, 736 F.3d 829, 839 (9th Cir. 2013) (identifying as a relevant factor whether police are responding to a domestic violence situation). Accordingly, the jury may have properly considered all evidence known to the Deputies prior to their encounter with Ochoa when assessing the need for the force used.

1. Severity of Crime Issue

Ochoa argues that "[i]t cannot be reasonably argued that this case involves the crime of domestic violence" because the Deputies were not investigating a crime of violence, and Ochoa's actions on the day the Deputies executed his arrest warrant did not involve violence or threatened violence. (Doc. 131 at 13.) On January 27, 2018, officers arrived at Ochoa's residence to arrest him pursuant to a no-bail warrant for his failure to appear in court for the charge of felony spousal abuse. (Doc. 131-2 at 1-2; Doc. 142-1 at 33.) Despite Ochoa's pending charge for felony spousal abuse, the impetus of the warrant that officers were executing, Ochoa contends the crime of domestic violence is irrelevant to the totality of circumstances in the use of force analysis. (Doc. 131 at 13.) Ochoa provides no authority for his conclusion that the "severity of the crime" factor may only encompass crimes that the police are actively investigating or that he committed on the day of his encounter with Deputies Brock and Bassett. The Court has not found any case law which limits the first excessive force factor in this way.

To the contrary, the excessive force test provides flexibility to account for relevant facts not explicitly listed in the *Graham* factors. *Mattos v. Agarano*, 661 F.3d 433, 4421 (9th Cir. 2011) ("[I]n assessing the governmental interests at stake under *Graham*, we are free to consider issues outside the three enumerated above when additional facts are necessary to account for the totality of circumstances in a given case."). Accordingly, courts acknowledge that the plaintiff's criminal history impacts the severity of the crimes involved when determining the need to use force. *See Miller v. Clark Cnty.*, 340 F.3d 959, 960, 964 (9th Cir. 2003) (evaluating not only the traffic infraction which plaintiff committed on the day he encountered police but also the information available to officers that showed plaintiff was wanted for the felony of attempting to flee from police by reckless driving); *see also James v. Hayward Police Dep't*, 2012 WL 1895952, at *10 (N.D. Cal. May 23, 2012), *aff'd sub nom. James v. Puga*, 585 F. App'x 510 (9th Cir. 2014) (acknowledging that the initial offense plaintiff committed was not serious but plaintiff had a known history of resisting arrest which impacted the totality of circumstances facing officers while trying to arrest the plaintiff).

Evidence presented at trial shows that Deputies Brock and Bassett knew of Ochoa's

1    pending domestic violence charge. (Doc. 142-1 at 9, 33.) The jury may have reasonably

2    concluded that Ochoa's history of alleged violence, especially in the domestic setting, suggests

3    that he may present a dangerous or violent response during his encounter with Deputies Brock

4    and Bassett. Moreover, Ochoa's no-bail warrant for failure to appear in his domestic violence

5    case suggests a propensity for evading criminal prosecution and arrest.

6          Ochoa further contends that his holding the three individuals hostage is irrelevant because

7    it does not meet the legal definition of "hostage" under California law. Penal Code § 210.5. (Doc.

8    131 at 14.) Ochoa asserts that "there is no evidence that Ochoa's reported refusal to allow them to

9    leave the residence substantially increased the risk of harm to them."[3] (*Id.*) Again, Ochoa lacks

10   any legal support to suggest that the severity of the crime factor may only include criminal

11   activity which, assessed after the fact, meets all statutory elements. Even if not a criminally

12   chargeable offense in hindsight, the hostage situation that Ochoa created by not allowing

13   occupants to leave the home increased the severity of crimes known to the officers when they

14   arrived. *See Sanders v. City of Fresno*, 551 F. Supp. 2d 1149, 1169 (E.D. Cal. 2008) (the officers'

15   reasonable belief "that a hostage situation could develop or was developing," while investigating

16   a call describing a domestic violence situation, indicated the situation involved "at least medium

17   level crimes" even if only formally classified as false imprisonment). The jury may have

18   reasonably inferred that the hostage situation, coupled with Ochoa's prior charge for domestic

19   violence and refusal to submit to arrest, indicated to the officers a pattern of crimes involving

20   violence and risk of public harm. Substantial evidence presented at trial demonstrates Ochoa

21   participated in violent crimes before and during the encounter with Deputies Brock and Bassett.

22       2. <u>Immediate Threat of Safety to Officers and Others</u>

23         Ochoa contends that the undisputed facts indicate he "posed no threat whatsoever to

24   officer safety" when Deputies Brock and Bassett used force. (Doc. 131 at 14.) The Deputies, on

25   the other hand, testified that they perceived Ochoa as posing a threat to theirs and others' safety

---

[3] Although the evidence presented during trial may have not explicitly explained the risk of harm Ochoa caused the hostages, the jury may have reasonably inferred substantial risk of harm to the hostages, given the presence of a multi-membered police team, armed with non-lethal weapons and a canine which the Deputies deployed because Ochoa refused to submit to arrest or follow police instructions.

10

and contend the objective circumstances substantiate their perceived threat. (Doc. 142 at 10.)

Under the objective reasonableness test, "a simple statement by an officer that he fears for his safety or the safety of others is not enough." *Deorle*, 272 F.3d at 1281. Objective factors must exist to justify the concern. *Id.* "In short, an officer's use of force must be objectively reasonable based on his contemporaneous knowledge of the facts." *Id.* "If the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat" may justify the belief of an immediate threat. *George*, 736 F.3d at 838. The objective reasonableness of the perceived threat "must be 'judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Boyd v. Benton Cty.*, 374 F.3d 773, 779 (9th Cir. 2004) (quoting *Graham*, 490 U.S. at 396).

Substantial evidence was presented at trial to provide objective corroboration of the officers' belief that Ochoa posed a safety threat. Prior to their arrival, officers received conflicting information about whether Ochoa had weapons in the residence. (Doc. 142-1 at 34.) When officers encountered Ochoa in the bathroom, they had not had an opportunity to search the bathroom, nor could they see into every area of the bathroom to ensure that Ochoa could not access a weapon. (*Id.* at 10, 15, 24.) Ochoa contends that Deputy Brock testified that Ochoa did not make "any movements which he interpreted to be consistent with Ochoa actively reaching for something resembling a weapon." (Doc. 131 at 7.) Ochoa misconstrues the testimony. In fact, Deputy Brock testified that Ochoa "was moving [his hands] down by his waistband as he was clenching his fist and screaming." (Doc. 142-1 at 22.) A jury may have reasonably inferred from Ochoa's erratic behavior that he was reaching for a weapon or searching for something with which to physically resist the officers. Even though, in hindsight, the information reveals that Ochoa was not armed, from the perspective of the Deputies during the incident, the Deputies had a reasonable suspicion that Ochoa may have been armed.

In addition to confronting a potentially armed suspect, Ochoa's history of violent behavior further corroborates that he posed a threat. As previously discussed, the Deputies had knowledge of Ochoa's domestic violence history, priming them for a potentially dangerous situation before their arrival at the residence. Before entering the bathroom, officers rescued three individuals

11

1  from the residence whom Ochoa would not permit to leave without the officers' intervention.
2  Deputy Bassett testified that he interacted with the minor female in the house who seemed
3  frightened and could not escape through the window. (Doc. 142-1 at 8, 35.) He testified that he
4  believed "there were people inside that house that were not able to leave and being held against
5  their will." (*Id.* at 8.) Deputy Brock explained that after officers rescued the three individuals,
6  they wanted to quickly apprehend Ochoa to allow them to "search for any additional hostages."
7  (*Id.* at 15.) From the dynamic hostage situation, Deputy Brock concluded "potentially, human life
8  was in danger."[4] (*Id.* at 17.)

Viewing the evidence in the light most favorable to the jury's verdict, substantial evidence exists to support the conclusion that the officers reasonably perceived that Ochoa posed a threat to their safety or that of others.

### 3. Resistance or Fleeing Arrest

Ochoa contends that the undisputed facts show that he only passively resisted officers by not following their instructions and was simply seated on the toilet or "on the ground beneath two considerably larger deputies" when the Deputies used force. (Doc. 131 at 15.) Ochoa argues that the "fact that Ochoa may have resisted apprehension *prior to the time force was used* is immaterial, as the Ninth Circuit has recognized that when a suspect flees then hides, the suspect's flight has terminated, at least temporarily." (*Id.* (emphasis in original) (citing *Chew*, 27 F.3d at 1442).) Ochoa contends that immediately prior to Deputy Brock's launching the 40mm non-lethal round, he did not physically resist officers and did nothing other than fail to respond to officers' commands. (*Id.*) Ochoa argues that Ninth Circuit case law has repeatedly held that passive resistance does not justify the application of a non-trivial amount of force. (*Id.* at 15-17.)

Ochoa's argument mischaracterizes the evidence presented and the excessive force standards. First, the Ninth Circuit does not require the court or the jury to consider any one factor

---

[4] To the extent Ochoa argues that Deputy Bassett's belief that other hostages may have been in the home is not credible because the officers had already rescued the three known individuals in the home (Doc. 131 at 14), the Court does not evaluate credibility of testimony on a Rule 50(b). Where the evidence presented conflicts, the jury was free to believe the officers' statements. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986) ("If reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed.").

of the reasonableness inquiry in isolation. "Even passive resistance may support the use of some degree of governmental force if necessary to attain compliance, however the level of force an individual's resistance will support is dependent on the factual circumstances underlying that resistance." *Nelson v. City of Davis*, 685 F.3d 867, 881 (9th Cir. 2012) (internal quotations omitted). Indeed, in each case Ochoa cites to support his legal contention that passive resistance cannot warrant more than minimal force, the court considered not only the level of resistance by the plaintiffs, but also the severity of the crimes involved and the threat to safety posed. (Doc. 131 at 15-16.) Thus, to the extent Ochoa argues his alleged passive resistance is dispositive to the reasonableness or unreasonableness of the Deputies' intermediate or significant force, this contention contradicts clearly established law.

Second, as previously discussed, the objective reasonableness assessment considers the circumstances leading up to and immediately prior to the Deputies' use of force. *See Hung Lam*, 869 F.3d at 1087. Although Ochoa suggests that the Ninth Circuit's holding in *Chew* limits the analysis to events at the moment force was deployed, *Chew* does not support this contention. 27 F.3d at 1442. In *Chew*, the Ninth Circuit concluded the suspect's flight had terminated temporarily when he fled and then hid in a scrapyard for an hour and a half. *Id.* Nonetheless, the resisting or fleeing arrest factor tipped slightly in favor of the government because the suspect had attempted to evade arrest by fleeing. *Id.* Though the resisting or fleeing *Graham* factor favored the government, the suspects' hiding for an hour and a half, not in the immediate vicinity of officers or others, created questions of fact as to whether the plaintiff posed an "*immediate*" safety threat. *Id.* (emphasis in original). In weighing all the factors, the Ninth Circuit determined the case should be decided by a jury. *Id.* at 1442-43. The *Chew* decision demonstrates that intervening factors, such as a time gap between fleeing arrest and use of force as well as the suspect hiding in an unpopulated location, may diminish the threat and resistance level that the suspect posed. However, the Ninth Circuit did not hold that the presence of intervening factors renders irrelevant the rest of the *Graham* factors.

Even still, the intervening factors in *Chew* are not present in Ochoa's case. He did not abscond into an unpopulated area away from police and others. Rather, he held hostages in the

1   home and barricaded himself in the bathroom while officers were in the vicinity. (Doc. 142-1 at 8,
2   17, 24, 32.) Moreover, nothing in the testimony suggests that Ochoa engaged in an extended
3   period of non-evasive behavior. Rather, the evidence shows he made consistent and ongoing
4   attempts to avoid the police because he refused to allow officers in the home when they arrived,
5   continually re-locked the door once officers had the key to unlock it and locked himself in the
6   bathroom when the officers breached the home. (*Id.* at 12, 38; Doc. 131-2 at 1-2.)

7        Third, Ochoa engaged in greater resistance than the plaintiffs in the cases upon which he
8   relies. For example, in *Young v. County of Los Angeles*, the police used pepper spray and struck a
9   minor plaintiff with a baton after stopping him for a seatbelt violation, while the minor sat on the
10  sidewalk curb eating his broccoli but refusing to reenter his vehicle. 655 F.3d 1156, 1163-66 (9th
11  Cir. 2011). The Ninth Circuit reversed summary judgment because a genuine issue of material
12  fact existed as to whether the use of force was reasonable given the lack resistance or threat
13  imposed by the plaintiff. *Id.* In contrast, as discussed above, Ochoa's criminal history includes
14  crimes of domestic violence and creating a hostage situation from which the jury may have
15  reasonably concluded Ochoa posed a safety threat. In addition, Ochoa's level of resistance rises
16  above that of *Young* because he made several more serious attempts to evade officers. Ochoa
17  refused to allow officers in the house, he held hostage in the house to further avoid contact with
18  police, and then barricaded himself in the bathroom to avoid arrest. (Doc. 142-1 at 8, 12, 38; Doc.
19  131-2 at 1-2.) Finally, when the officers breached the bathroom, Ochoa was screaming and
20  reaching around his waistband as if to resist officers with a weapon. (*Id.* at 13-14, 22.)

21       Arguably, the *Smith v. City of Hemet* case presents the most factually similar comparison.
22  394 F.3d 689, 701-03 (9th Cir. 2005). In *Smith*, police responded to a report from the plaintiff's
23  wife that plaintiff engaged in domestic violence against her. *Id.* at 693. When police arrived at the
24  residence, the plaintiff was outside on the front porch and refused to comply with police
25  instruction to show his hands and show he had no weapons. *Id.* The officers deployed pepper
26  spray four times and "sicced" the police canine on the plaintiff three times to subdue him. *Id.* at
27  702. Although some parallels exist with Ochoa's encounter with the Deputies, given the
28  preexisting domestic violence complaint and similar types of force used on non-compliant

suspects, the *Smith* plaintiff did not barricade himself to abscond from the police, and the officers in *Smith* did not confront a hostage situation. Although the *Smith* plaintiff reentered his home, he also invited officers to join him. *Id.* at 693. The *Smith* plaintiff showed greater cooperation with police than Ochoa. Most importantly, however, the procedural posture of *Smith* is dispositive. The Ninth Circuit concluded material disputed facts existed in *Smith* as to *preclude* judgment as a matter of law on a motion for summary judgment. *Id.* at 703. As the Ninth Circuit noted, the "reasonableness of force used is ordinarily a question of fact for the jury" and "judgment as a matter of law in excessive force cases should be granted sparingly." *Id.* at 701 (internal citations omitted). The Court likewise defers to the jury's determinations and inferences drawn regarding Ochoa's level of resistance and the need for Deputy Brock to deploy the 40mm less-than-lethal round.

Regarding Ochoa's resistance after Deputy Brock struck Ochoa and immediately prior to Deputy Bassett deploying his police canine, substantial evidence supports a conclusion that Ochoa physically resisted the officers. Ochoa contends that prior to deployment of Hero, Deputy Brock was "straddling" Ochoa, who was lying face down. (Doc. 131 at 8.) The Deputies' testimony explains that while in this position, Ochoa physically struggled with the officers against their attempts to arrest him. Deputy Bassett testified that Ochoa was lying face down with his hands over his head, pushing up against the bathroom wall, with his elbows driving his hips upward and kicking his feet. (Doc. 142-1 at 7.) Because Ochoa's actions include a physical struggle, they do not constitute merely passive resistance as a matter of law. *Compare Green v. Garnet*, 2015 WL 6407208, at *3 (C.D. Cal. July 9, 2015) (finding the plaintiff indisputably engaged in "active physical resistance" where he "swung and kicked at the officer during the encounter"); *with Rodriguez v. City of Modesto*, 2015 WL 1565354, at *27 (E.D. Cal. Apr. 8, 2015) (finding the plaintiff's actions did not include a physical struggle and therefore "do not rise to active resistance, as a matter of law").[5]

---

[5] To the extend Ochoa argues that the height discrepancy between himself and the officers rendered the use of Hero unnecessary (Doc. 131 at 9, 15.), he improperly applies the standard of review for Rule 50(b) motions. Ochoa relies on his shorter stature to imply that the three larger officers could have physically subdued him without needing to deploy Hero. The Court's role on a Rule 50(b) motion, however, does not include applying factual inferences in the

15

1     Given Ochoa's consistent attempts to evade arrest, the use of human hostages to further his avoidance of the officers, and the physical struggle he engaged in with officers in the bathroom, the jury may have reasonably concluded that Ochoa actively resisted arrest.

**D.    Weighing Totality of Circumstances**

    Finally, at step three, the excessive force analysis requires a balancing of "whether the degree of force used was warranted by the governmental interest at stake." *Deorle*, 272 F.3d at 1282. The balancing considers whether the force used was "greater than is reasonable under the circumstances." *Santow v. Gates*, 287 F.3d 846, 854 (9th Cir. 2002); *see also Young*, 655 F.3d at 1161 (a court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion to determine whether it was constitutionally reasonable.")

    The jury had substantial evidence from which to conclude that Deputies Brock and Bassett had a strong governmental interest that justified the intermediate to significant force used to arrest Ochoa. Ochoa's pending domestic violence charge coupled with the ongoing hostage situation evinced Ochoa's tendency to cause domestic disturbances and resort to violence in the home, which is one of the most dangerous situations that police encounter. *George*, 736 F.3d at 839 ("Domestic violence situations are 'particularly dangerous' because 'more officers are killed or injured on domestic violence calls than on any other type of call.'" (quoting *Mattos*, 661 F.3d at 450)). Even though Ochoa's domestic violence charge occurred prior to the confrontation with the Deputies, it informed the Deputies of Ochoa's propensity for violence and may have influenced their perspective in assessing the overall threat of the situation. *Price v. Sery*, 513 F.3d 962, 968 (9th Cir. 2008) ("[A] law enforcement officer's use of force will be justified, or not, by what that officer reasonably believed about the circumstances confronting him.").

    With this perspective of Ochoa's history of violence, the Deputies encountered Ochoa barricaded in an unsearched and not fully visible bathroom and who was screaming and refusing to comply with orders to submit to arrest peacefully. The Deputies' uncertainty as to the presence of weapons or hostages also factors into their overall threat assessment. Ochoa's erratic and

---

movant's favor. *Go Daddy*, 581 F.3d at 961. Accordingly, the Court disregards this argument.

evasive behavior immediately prior to Deputy Brock's deployment of the 40 mm less-than-lethal round further demonstrated that he posed a threat of violence and safety to officers and others. *Tatum v. City & Cnty. of San Francisco*, 441 F.3d 1090, 1097 (9th Cir. 2006) (holding the potential for violence by the plaintiff, who was "behaving erratically and resisting arrest," factored into the overall circumstances of the need for force). The threat posed by the suspect to officer and public safety is often the most important factor in determining whether officers' use of force was reasonable and necessary. *Mattos*, 661 F.3d at 441. Thus, the totality of the circumstances shows Ochoa posed an objectively reasonable threat of violence, and the officers had a strong governmental interest in maintaining public safety, including their own safety and the safety of others in the home. *Mehta v. City of Upland*, 748 F. App'x 739, 742 (9th Cir. 2018) ("[T]he government had a strong interest in arresting those suspected of committing felonies and in protecting the safety of the officers and public.").

Moreover, Ochoa demonstrated a pattern of evasive behavior to avoid arrest by refusing to allow police access to his home, by barricading himself in the bathroom, by refusing to comply with officers' instructions, and by physically resisting arrest on the floor of the bathroom. Ochoa also had a known history of avoiding criminal prosecution by failing to appear in court for his domestic violence charge. Indeed, Ochoa admitted at trial that he did not want to go back to jail. (Doc. 142-1 at 25.) The officers gave repeated warnings to Ochoa that he needed to submit to arrest and that officers intended to use force, yet Ochoa refused to comply. *Nehad v. Browder*, 929 F.3d 1125, 1137 (9th Cir. 2019) ("Whether an officer warned a suspect that failure to comply with the officer's commands would result in the use of force is another relevant factor in an excessive force analysis."). The Deputies had a strong governmental interest in securing the arrest of a violent offender particularly when faced with such persistent, strong resistance. *Miller*, 340 F.3d at 964 (explaining the "government has an undeniable legitimate interest in apprehending criminal suspects [] and that interest is even stronger when the criminal is . . . suspected of a felony" (internal citations omitted)).

Viewing the totality of the evidence, the Court concludes that a reasonably jury could have found that these strong governmental interests justified intermediate to significant uses of

force, including the 40 mm less-than-lethal round and deployment of Hero. Even though a reasonable jury may have conversely found Ochoa's version of events credible—that he was simply passively sitting on the toilet and posed no threat or resistance to officers other than failing to comply with commands—it was equally appropriate for the jury to discount Ochoa's testimony and believe the Deputies' version of the facts. *Reed v. City of Modesto*, 122 F. Supp. 3d 967, 974 (E.D. Cal. 2015) ("Defendant [] is an interested witness and the jury is not required to believe his testimony."). As often occurs with excessive force cases, the many factual disputes and varying inferences therefrom necessitate deference to the jury's verdict given the substantial evidence that supports the jurors' conclusions. Accordingly, Ochoa has not met his burden to show that the only reasonable conclusion from the evidence is contrary to that of the jury. His motion for judgment as a matter of law is **DENIED**.

**E.      Motion for a New Trial**

Ochoa's notice of his motion states that in the alternative to a motion for judgment as a matter of law, Ochoa seeks a new trial. (Doc. 131 at 1-2.) It is unclear whether Ochoa seeks a new trial as a separate form of relief under Rule 50(b)(2) or intended to make separate motion pursuant to Rule 59. His briefs in support of the motion contain no argument, citation to authority, or recitation of the statutory basis concerning his request for a new trial. (*See* Doc. 131; Doc. 143.) To the extent the request for new trial arises under a form of relief pursuant to Rule 50(b), the Court **DENIES** this request because Ochoa has not met his burden for judgment as a matter of law, as explained above.

To the extent Ochoa intended his request for a new trial to be construed as a Rule 59 motion, he has not provided any argument or legal authority upon which the Court can grant the motion. Though the standards for granting a Rule 50(b) motion and a Rule 59 motion may share some overlap, they also differ in significant ways. *See Experience Hendrix L.L.C. v. Hendrixlicensing.com LTD*, 762 F.3d 829, 842 (9th Cir. 2014) ("Unlike with a Rule 50 determination, the district court, in considering a Rule 59 motion for new trial, is not required to view the trial evidence in the light most favorable to the verdict. Instead, the district court can weigh the evidence and assess the credibility of the witnesses."); *see also Molski v. M.J. Cable,*

*Inc.*, 481 F.3d 724, 729 (9th Cir. 2007) (recognizing the grounds for Rule 59 new trial motion include a verdict that is contrary to the weight of the evidence, a verdict based on false or perjurious evidence, or to prevent a miscarriage of justice). Because Ochoa does not address the Rule 59 standards in his briefing, the motion fails for lack of legal or evidentiary support. Accordingly, Ochoa's motion for a new trial is **DENIED**.

## IV. ORDER

For the reasons set forth above, the Court **ORDERS**:

1. Ochoa's motion for judgment as a matter of law or, alternatively, for a new trial is (Doc. 131) **DENIED**.

IT IS SO ORDERED.

Dated: **February 21, 2023**

UNITED STATES DISTRICT JUDGE